HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| KERMIT B. WOODEN, | No. 11-cv-5472-RBL |
| Plaintiff, | ORDER |
| v. | (Dkt. #26, 48, 50) |
| PAULA HAMMOND et al., | |
| Defendants. | |

Mr. Wooden is a black, 58-year-old male and the former human-resources director of the Washington State Department of Transportation ("WSDOT"). He alleges that Ms. Hammond, the Secretary of Transportation and other WSDOT employees discriminated against him based on his race and age. Mr. Wooden presents federal claims under 42 U.S.C. §§ 1981, 1983, 2000e and state-law claims under the Washington Law Against Discrimination, Wash. Rev. Code §§ 49.60, 49.44. (*Id.* at 8.) After review of all materials, the Court must grant summary judgment.

## I.   FACTUAL BACKGROUND

In 2002, WSDOT hired Mr. Wooden as the Director of Human Resources, an at-will employment position. (Compl. at 3.) Ms. Hammond fired Mr. Wooden in October 2010, at the end of what Defendants characterize as a six-month "downward spiral." (*Id.* at 7.) The spiral commenced in March 2010, when Mr. Wooden "yelled and berated" WSDOT's Leave and Benefit Manager, Ms. Dawley, during a meeting until she "left the room in tears." (*Id.* at 7.) Bill Ford, Mr. Wooden's immediate supervisor, issued a written admonishment regarding the

Order - 1

incident. Stephen Reinmuth, WSDOT's chief of staff, Ms. Dawley, and Jessica Todorovich all state that Mr. Wooden became increasingly aggressive and difficult to deal with after the reprimand. (Reinmuth Decl. ¶ 10, Dkt. #28, Dawley Decl. ¶¶ 3, 8, Dkt. #31, Tobin Decl., Ex. 4 at 10, Dkt. #29-4.) Ms. Todorovich described Mr. Wooden's changing behavior:

> [F]or the majority of the time that I worked for him, he was a very good manager. . . . During the last year and half or so, Kermit became increasingly frustrated. He would yell more. He would become frustrated more quickly with things . . . . He got more angry, became less open to change and to making decisions and became very aggressive in his behavior.

(Tobin Decl., Ex. 4 at 10 (Todorovich Dep.)). These incidents appear to have been routine. In April 2010, Mr. Wooden proceeded to yell at a subordinate for 45 minutes. (*Id.* at 14–15 ("There were a number of times where in meetings . . . Kermit would get upset and get visibly loud, I mean, quite often.")).

In July 2010, WSDOT received a report from an independent investigator, Ms. Claire Cordon, hired to examine allegations of "sexual improprieties" and hostility.[1] (Defs.' Mot. for Summ. J. at 7.) The Cordon report detailed a series of inappropriate comments, bullying, and unprofessional behavior. (*Id.* at 8.)

In September 2010, in what Defendants claim was the "tipping point," three WSDOT managers brought their complaints about Mr. Wooden to Mr. Reinmuth. (Defs.' Mot. for Summ. J. at 9.) In a written memorandum, Ms. Todorovich, Ms. Dawley, and Ms. Niki Pavlicek listed the following regarding Mr. Wooden:

- Cussing, screaming, and threatening. . . .
- [T]old his staff that he is not going to change his behavior and will continue to be just like he is, after he was counseled regarding his rude and offensive behavior. . . .
- [W]ill use intimidation to ensure that his staff will "go along with what he wants.
- He will tell us untrue information in order for us to be his witness or corroborate his story.
- He wants to ensure that none of his staff form any relationships with management outside the HR office.

---

[1] Plaintiff moves to exclude the Cordon Report as hearsay. The Report is admissible, however, as it is not offered for the truth of the matter asserted, but to establish Ms. Hammond's state of mind—whether discriminatory or not—when she terminated Mr. Wooden. The existence of the report and its general substance is relevant, but the Court does not delve into the individual allegations made in the report.

(Dawley Decl., Ex. 1, Dkt. #31-1.)  Further, the memorandum states that Mr. Wooden indicated he would not promote two employees (Jenny White and Audrey Ulrich) in retaliation for taking their complaints to Mr. Wooden's superiors and perceived disloyalty.  (*Id.*)  Lastly, the memorandum states that "[o]n multiple occasions he has referenced that he will file a lawsuit against the department and that he is building a case for this."  (*Id.*)  Bill Ford issued a second written admonishment in response to these complaints.

Apart from these discrete incidents, Defendants also present larger issues with Wooden's management.  Defendants argue that Wooden refused to take direct orders from his superiors.  For example, Wooden apparently misrepresented Hammond's views during a labor negotiation concerning layoffs.  (Defs.' Mot. for Summ. J. at 6.)  Ms. Todorovich, present at the negotiations, stated that Wooden took positions contrary to what Ms. Hammond had directed and lied to the negotiator when asked "Is this what your executives want?"  (Tobin Decl., Ex. 4 at 27 (Todorovich Dep.)).  In addition, Wooden seemed to attract lawsuits.  In 2005, he admitted to engaging in an affair with a subordinate, which ultimately led to a lawsuit and settlement.  (Defs.' Mot. for Summ. J. at 3.)  Since that time, six cases have been filed against Mr. Wooden, arising from his personal conduct and alleging discrimination, retaliation, and creating a hostile work environment.  (*Id.* at 4.)

After Ms. Hammond terminated Mr. Wooden, she hired Kathryn Taylor, a 48-year-old white female who had worked for Weyerhaeuser and served as a director of the WSDOT Public Transportation Division.  (Defs.' Mot. for Summ. J. at 11.)

Following the commencement of this suit, the State conducted a comparative salary analysis and found Mr. Wooden to be the highest paid human-resources director of any agency in Washington, making $119,832, averaging 26% more than other human-resource directors.  (*Id.* at 12.)  Ms. Taylor, having assumed the role, now makes precisely the same amount.  (*Id.*)

Wooden fails to dispute any of these facts, although he adds a few.[2]  As a basis for his wage-discrimination claim, Wooden alleges in a footnote that an unnamed white male manager of the WSDOT Ferries Division made more than he did in 2002, although he fails to provide any

---

[2] Indeed, Plaintiff's Response brief contains a section entitled "Agreed Material Facts," but provides no clear detail as to any disputed material facts.

evidence other than his own recollection. (Pl.'s Resp. at 2, Dkt. #35 (citing Wooden Decl. at 2, Dkt. #36)). Further, Wooden states that WSDOT discriminated against him in awarding "ERCs," or Extra Responsibility Credit, which are temporary pay increases when additional duties warrant. (*Id.* at 12–13.) Wooden states that he received temporary ERCs, but non-minority "others" received permanent ERCs. (*Id.* at 13.) Plaintiff's counsel fails to explain when or why Wooden should have received permanent ERCs, how his added responsibilities compared to those who received permanent ERCs, or why additional pay was warranted when he was already the highest-paid agency HR director in the state.

As the basis for his disparate-treatment claim, Wooden recollects that two WSDOT employees, David Hamrick and Bob Covington, were given less harsh penalties for what he describes as similar offenses (although, confusingly, Mr. Hamrick was ultimately fired). Wooden provides no evidence other than his own memory.

On his retaliation claim, Wooden states that his reprimands in April and September were in retaliation for complaining about "discrimination and a hostile work environment" to Mr. Reinmuth. (Pl.'s Resp. at 23.)

Wooden also implies that discrimination is prevalent at WSDOT because it failed to meet the goals of its own affirmative action plan in 2009 and 2010. (*Id.* at 5 ("[N[one of the goals established in the affirmative action plan were met in 2009 and 2010.")). Wooden provides a spreadsheet entitled "WSDOT Agency-Wide Utilization Analysis Report," which shows that WSDOT "significantly underutilized minority persons (except Asians or pacific Islanders [sic]) as officials or administrators." (Pl.'s Resp. at 4 (citing Wooden Decl., Ex. P.))

Lastly, Wooden stresses that he received "satisfactory or greater" performance reviews throughout his tenure, although the last review took place in March 2010—just before he was issued his first formal reprimand. (*Id.* at 3.)

## II.   DISCUSSION

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to

summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

As an initial matter, it is difficult to discern Plaintiff's exact claims. The Complaint provides no clear list, and Plaintiff's briefing is somewhat jumbled. Defendants necessarily guessed at his claims, listing them as (1) race-based discrimination and retaliation under 42 U.S.C. § 1981; (2) age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 623 ("ADEA"); (3) a race-based discrimination and retaliation claim under Title VII, 42 U.S.C. § 2000e; and (4) race- and age-based discrimination and retaliation under the Washington Law Against Discrimination, Wash. Rev. Code § 49.60 ("WLAD"). (Defs.' Mot. for Summ. J. at 14.) Plaintiff has not taken issue with this.

**A.    Racial Discrimination and Retaliation Under Title VII and § 1981**

Plaintiff's claim under § 1981 is flatly barred by sovereign immunity under the Eleventh Amendment. *Pittman v. Oregon Employment Dep't*, 509 F.3d 1065, 1074 (9th Cir. 2007) ("[W]e hold that § 1981 does not contain a cause of action against states."). There is no suggestion that Washington has waived its immunity.

**B.    Age Discrimination Under ADEA**

Plaintiff's claim under ADEA is flatly barred by sovereign immunity under the Eleventh Amendment. *See Katz v. Regents of the Univ. of Calif.*, 229 F.3d 831, 834 (9th Cir. 2000) (citing *Kimel v. Florida Bd. of Regents*, 528 U.S. 62 (2000). There is no suggestion that Washington has waived its immunity.

### C. Racial Discrimination and Retaliation Under Title VII

Defendants argue that Plaintiff's Title VII claims are barred because he failed to file an EEOC charge within 180 days. Title VII requires plaintiffs to "file a charge with the Equal Employment Opportunity Commission (EEOC) either 180 or 300 days after the alleged unlawful employment practice occurred." *Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002); 42 U.S.C. § 2000e-(5)(e). Plaintiff expressly concedes that the statute of limitations began to run on June 20, 2008. (Pl.'s Resp. at 14, Dkt. #35 ("The statute began to run on 20 June 2008.").  He filed his EEOC charge in December 2010—two and a half years later.

For reasons that are unclear, Plaintiff entirely fails to address the 180-day limitation on the EEOC charge, instead discussing the general three-year limitation provided by Wash. Rev. Code § 4.16.080. Thus, the Court must conclude that Plaintiff's claims under Title VII are untimely, except for his claim of retaliation (which will be addressed below).

### D. Race- and Age- Based Discrimination Under WLAD

Plaintiff alleges that WSDOT terminated him based on his age, paid him less than similarly-situated non-minorities, and disciplined him more seriously than comparable non-minorities. WLAD makes it unlawful for employers "[t]o discharge or bar any person from employment because of age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical disability." Wash. Rev. Code § 49.60.180(2).

In order to make out a prima facie case for racial or age discrimination based on disparate treatment, a plaintiff must demonstrate: (1) he belongs to a protected class; (2) he was treated less favorably in the terms and conditions of his employment; (3) than a similarly situated, non-protected employee. A plaintiff must also show that he and the comparator were doing substantially the same work. *Washington v. Boeing*, 105 Wash. App. 1, 13 (2001). Washington has, for the most part, adopted the burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), making the test for disparate treatment under WLAD similar to the federal test for disparate treatment under Title VII and the ADEA. *Hill v. BCTI Income Fund-I,* 144 Wash. 2d 172, 180 (2001); *Johnson v. Express Rent & Own, Inc.,* 113 Wash. App. 858, 860, n. 2 (2002).

Once a plaintiff has established a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's treatment. *Johnson v. Dep't of Soc. & Health Servs.*, 80 Wash. App. 212, 227 (1996). At this point, the burden returns to the plaintiff to show that the employer's rationale is pretextual. *Id.* An employee can demonstrate pretext by submitting evidence that a non-minority comparator committed infractions that were similarly serious, but was not disciplined to the same degree as the minority or older employee. *Id.* Although the final burden of proof always rests with the plaintiff, the burden-shifting mechanism was designed to allow plaintiffs a fair chance at proving discrimination through indirect, circumstantial evidence, as is often necessitated in discrimination cases. *Hill*, 144 Wash. 2d at 180. Because of the fact-intensive nature of this inquiry, once a plaintiff has demonstrated that he is able to make out a prima facie case of race or age discrimination, summary judgment will generally be inappropriate. *Johnson*, 80 Wash. App. at 229.

Plaintiff is indisputably part of a protected class.

### 1. Age Discrimination Claim

Plaintiff presents no evidence of age discrimination whatsoever. His sole basis for the claim is that WSDOT hired Ms. Taylor, a 48-year old, in his place. Because Plaintiff has failed to make out a prima facie case, the claim is dismissed.

### 2. Race Discrimination Claim

Plaintiff fails to raise a prima facie case of racial discrimination in pay. He does not dispute that he was the highest paid human-resources director for any agency in Washington at the time of his termination. Further, he fails to identify any "comparator" performing "substantially the same work" that was treated more favorably. Because Plaintiff has failed to make out a prima facie case, the claim is dismissed.

### 3. Discriminatory Discipline

Plaintiff argues that two comparators—David Hamrick and Bob Covington—were treated more favorably after similar misbehavior. (Pl.'s Resp. at 18.) Plaintiff's "evidence" consists only of his own recollections. He alleges that Mr. Hamrick "was accused of rudeness and yelling at female employees and coming to work under the influence of alcohol." (*Id.*)

Plaintiff alleges that Mr. Hamrick received "training," and then was fired when the behavior continued. Even if Plaintiff's unsubstantiated allegations are true, Hamrick received the same discipline.

Plaintiff alleges that Mr. Covington "was accused by his staff of raising his voice, being verbally abusive, slamming doors and showing anger," and he received management training. (Pl.'s Resp. at 18.) Defendants explain, however, that Covington was in fact "the target of an anonymous complaint" whose allegations were found to be entirely unsubstantiated by an independent investigator. (Reinmuth Decl. ¶ 3, Dkt. #47.) This situation is entirely different from Plaintiff's, where he was formally admonished for bullying, his behavior had attracted six lawsuits, multiple employees testified to his sustained unprofessional conduct, and his own managers took their complaints directly to WSDOT executives.

Further, even if Plaintiff could raise a prima facie case that his termination was due to his race rather than performance, he fails to rebut any of Defendant's non-discriminatory reasons. Plaintiff argues that the lawsuits against him are commonplace, given his status in WSDOT. He highlights that Hammond herself has been named in thirteen lawsuits. (Pl.'s Resp. at 15.) But these lawsuits are entirely different: Hammond was named in her official capacity. Unlike the suits against Plaintiff, the suits against Hammond do not arise from her personal behavior. In short, assuming that Plaintiff could make out a prima facie case, he cannot show Defendants' reasons for his termination were pretext.

### E. Retaliation Under Title VII

Like the disparate treatment claims above, courts analyze Title VII retaliation claims under the *McDonnell Douglass* burden-shifting test. *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1411 (9th Cir. 1987). An employer violates Title VII by retaliating against an employee who has "opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e–3(a). To establish a prima facie case of discriminatory retaliation, a plaintiff must show that: (1) he engaged in activity protected under Title VII; (2) his employer subjected him to an adverse employment action; and (3) the employer's action is causally linked to the protected activity. *Jurado*, 813 F.2d at 1411 (citations omitted).

In his Complaint, Plaintiff alleged that Hammond fired him in retaliation for, presumably, complaining about a hostile work environment.[3] (*See* Compl. ¶¶ G, H, Dkt. #1.) It appears undisputed, however, that Ms. Hammond had no knowledge of these complaints (assuming they exist). (Pl.'s Resp. at 23 (noting that Reinmuth "didn't even tell Defendant Hammond")). In his response brief, Plaintiff now premises his retaliation claim on the written admonitions he received in April and September 2010.

Quite simply, there is no evidence of discriminatory treatment in the reprimands. Indeed, Plaintiff does not dispute that he acted unprofessionally toward Ms. Dawley, leading to the April reprimand. All the evidence suggests that Plaintiff's behavior continued (particularly Ms. Todorovich's testimony and the memorandum drafted by Plaintiff's managers), which led to the September reprimand. There is no basis for this claim, even in its newly-adopted form.

### F. Hostile Work Environment

Plaintiff makes fleeting references to a hostile work environment, and the Court will address the potential claim for the sake of thoroughness. To prevail on a hostile workplace claim premised, a plaintiff must show: "(1) that he was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2004). Plaintiff has presented no evidence whatsoever to support such a claim.

---

[3] The Court must infer this argument because the Complaint fails to clearly set the facts alleged.

### III.   CONCLUSION

For the reasons above, Defendants' Motion for Summary Judgment (Dkt. #26) is **GRANTED**.  The motions in limine (Dkts. #48, 50) are **MOOT**.  The case is **DISMISSED WITH PREJUDICE**.

Dated this 21st day of March 2013.

_____
RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE